**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **International Union of Operating Engineers, Local 399, AFL-CIO; International Union of Operating Engineers, Local 150, AFL-CIO; Construction and General Laborers' District Council of Chicago and Vicinity, Laborers International Union of North America, AFL-CIO; and Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**Village of Lincolnshire, Illinois; Peter Kinsey, Chief of Police; Elizabeth Brandt, Mayor; and Barbara Mastandrea, Village Clerk,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**Case No. 16 C 2395**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In December 2015, the Village of Lincolnshire adopted an ordinance that imposed new restrictions on labor relations between labor unions, employers, and employees. The plaintiffs, four unions that operate in Lincolnshire (the Unions), challenge the ordinance, alleging that it is invalid under the Supremacy Clause and deprives the Unions of their rights in violation of 42 U.S.C. § 1983. The Unions have moved for summary judgment. The defendants have filed a cross-motion for summary judgment, contending that each of the Unions lacks standing to bring at least one of the claims and that the Unions' claims lack merit.

For the reasons stated below, the Court concludes that three of the four unions lack standing to challenge a particular part of the Lincolnshire ordinance and that none of the unions may bring claims under section 1983 but otherwise denies defendants' motion for summary judgment. The Court concludes that all four unions have standing to challenge the remaining parts of the ordinance. The Court therefore grants summary judgment on the preemption claims in favor of all four unions, finding that federal law preempts the challenged provisions of the Lincolnshire ordinance.

**Background**

The plaintiffs are four labor organizations that operate within Lincolnshire. International Union of Operating Engineers, Local 399, AFL-CIO (Local 399) is the collective bargaining representative for a bargaining unit composed of workers at Colliers International Asset and Property Management, LLC in Lincolnshire. Compl. ¶ 5. International Union of Operating Engineers, Local 150, AFL-CIO (Local 150) is the collective bargaining representative for seven separate bargaining units with various businesses in Lincolnshire, including Central Boring, Inc.; Dick's Heavy Equipment Repair; C.R. Nelson Landscaping; Accurate Group, Inc.; D.C.S. Trucking Co.; Johler Demolition Inc.; and Revcon Construction Corp. *Id.* ¶ 6. Local 150 also alleges that it is the representative for numerous other units of employees who are likely to perform work in Lincolnshire in the future. *Id.* ¶ 8.

Construction and General Laborers' District Council of Chicago and Vicinity, Laborers International Union of North America, AFL-CIO (LDC) is party to three collective bargaining agreements that cover employees of employers located in Lincolnshire, including Central Boring, Inc.; Johler Demolition, Inc.; and Revcon

Construction Corp. *Id.* ¶ 9. LDC also alleges that it is the representative for numerous other units of employees who are likely to perform work in Lincolnshire in the future. *Id.* ¶ 11. Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America (CRC) is party to collective bargaining agreements covering units of employees who were scheduled to perform work in Lincolnshire starting in the spring of 2016. Compl. ¶ 13. CRC also alleges that it is the representative for numerous other units of employees who are likely to perform work in Lincolnshire in the future. Compl. ¶ 14.

Lincolnshire is a "home rule" unit as defined in the Illinois Constitution, meaning that it can "exercise any power and perform any function pertaining to its government and affairs." *See* Pls.' Corrected Br. in Supp. of Mot. for Summ. J. (Pls.' Opening Brief) at 1; Ill. Const. Art. VII, § 6. In December 2015, Lincolnshire passed Ordinance No. 15-3389-116. Pls.' Opening Br. at 1. In relevant part, the ordinance provides:

SECTION 4: GUARANTEE OF EMPLOYEE RIGHTS

No person covered by the NLRA shall be required as a condition of employment or continuation of employment with a private-sector employer:

(A) to resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization;
(B) to become or remain a member of a labor organization;
(C) to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization;
(D) to pay any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of labor organization; or
(E) to be recommended, approved, referred, or cleared for employment by or through a labor organization.

SECTION 5: VOLUNTARY DEDUCTIONS PROTECTED

> For employers located in the Village, it shall be unlawful to deduct from the wages, earnings, or compensation of an employee any union dues, fees, assessments, or other charges to be held for, transferred to, or paid over to a labor organization unless the employee has first presented, and the employer has received, a signed written authorization of such deductions, which authorization may be revoked by the employee at any time by giving written notice of such revocation to the employer.

Pls.' Resp. to Defs.' Stat. of Facts, Tab 13 Ex. C, 02475–76.

The Unions filed suit against Lincolnshire and three Lincolnshire officials in their official capacity: Chief of Police Peter Kinsey; Mayor Elizabeth Brandt; and Village Clerk Barbara Mastandrea. Compl. ¶¶ 15–18. The Unions contend that the quoted portions of the ordinance are preempted by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–69, and the Labor-Management Relations Act (LMRA), 29 U.S.C. §§ 401–531. *See* Pls.' Opening Brief at 1, 17–19. In particular, the Unions contend that sections 4(A)–(D) of the ordinance prohibit what are known as "union security agreements" and as such are preempted by the NLRA. Compl. ¶¶ 32–37. In count 2, the Unions allege that section 4(E) of the ordinance prohibits what are known as "hiring hall provisions" and that this section is likewise preempted by the NLRA. *Id.* ¶ 38. Finally, the Unions allege in count 3 that section 5 restricts what are known as "check-off provisions" and is preempted by the NLRA and the LMRA. *Id.* ¶ 40. On all three counts, the Unions request declaratory and injunctive relief, as well as damages and attorneys' fees as authorized by 42 U.S.C. § 1988. *Id.* ¶¶ 37, 39, 41.

## Discussion

The Unions have moved for summary judgment, arguing that the quoted

provisions of the Lincolnshire ordinance are preempted by federal law and that the Unions are entitled to judgment on the merits. Lincolnshire[1] has cross-moved for summary judgment, arguing that the Unions lack standing to bring these claims and that all four Unions' claims lack merit. The Court first addresses the issue of standing and the viability of the Unions' claim under 42 U.S.C. § 1983 and then addresses the preemption issue, which is argued in both sides' motions.

In considering each side's motion for summary judgment, the Court views the evidence in the light most favorable to the moving party and draws reasonable inferences in that party's favor. *See Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016). Summary judgment is appropriate only when there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., and its Local 2343 v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011).

## I.    Standing

In order to bring a claim in federal court, a plaintiff must have standing as required by Article III of the Constitution. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 587 (7th Cir. 2016). To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 587–88 (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). In response to a motion for

---

[1] Because the defendants have filed their motion and responses collectively, the Court will use the term "Lincolnshire" to refer to both the Village and the individual defendants.

summary judgment, the plaintiff bears the burden of establishing standing by setting forth specific facts through affidavits or other evidence. *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013).

The Unions allege that they are the collective bargaining representatives for various units of employees who are employed by companies located in Lincolnshire. The Unions allege that they have negotiated collective bargaining agreements on behalf of these employees that contain provisions now prohibited by the ordinance. The Unions further contend that the ordinance will invalidate these agreements and prevent the Unions from negotiating agreements with similar provisions in the future. In this way, the Unions allege that they have been injured by Lincolnshire's adoption of the ordinance and that this injury can be addressed through the requested relief. Lincolnshire contends that this is insufficient to establish the Unions' standing to challenge the ordinance.

It appears that the Supreme Court has not directly addressed what constitutes standing to bring a preemption challenge to state or local ordinances based on the NLRA or the LMRA. But in *Oil, Chemical & Atomic Workers International Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407 (1976), the Supreme Court held that laws like the one at issue here, commonly referred to as "right-to-work laws," apply only to employees whose "predominant job situs" is located within the jurisdiction that passed the ordinance. *Id.* at 412–14. It would appear, therefore, that Lincolnshire's ordinance imposes limits on the Unions' agreements—and thus generates an injury sufficient to confer standing—only if the Unions represent employees who work *predominantly* in Lincolnshire under agreements containing provisions prohibited by the ordinance.

### A.    Local 399

Lincolnshire concedes that Local 399 has standing to bring counts 1 and 3.

Defs.' Mem. in Supp. of Mot. for Summ. J. and Resp. in Opp'n to Pls.' Mot. for Summ. J.

(Defs.' Opening Br.) at 4.  Lincolnshire argues that Local 399 lacks standing to bring

count 2 because it has not alleged that it has entered into any agreements containing

the hiring hall provisions prohibited by section 4(E).  Defs.' Opening Br. at 8.  The

Unions do not dispute this contention.  *See* Pls.' Resp. Br. in Opp'n to Defs.' Mot. for

Summ. J. (Pls.' Reply) at 1 n.1 (indicating only that Local 399 has entered into

agreements containing union security agreements and check-off provisions).  The Court

therefore concludes that Local 399 lacks standing to bring count 2.

### B.    Local 150

Lincolnshire next argues that Local 150 lacks standing to bring any of the claims

alleged in the complaint.  Defs.' Opening Br. at 5–6, 8–9.  Lincolnshire says that Local

150 has failed to establish that it will be affected by the ordinance, because it has not

shown that it represents any employee whose predominant job site is in Lincolnshire.

*Id.* at 5.  The Court finds, however, that the Unions have established that employees

represented by Local 150 work predominantly in Lincolnshire.

Local 150 submitted declarations by two of its members who meet the

requirements for standing.  One member, Roberto Zavala, stated that he works for

Revcon Construction Corp., located in Lincolnshire.  Pls.' Resp. to Defs.' Stat. of Facts,

Tab 10 (Zavala Decl.) ¶ 2.  Zavala further indicated that he spends the "vast majority of

[his] workday, about 80% to 90%" working at Revcon's facility in Lincolnshire.  *Id.* ¶ 3.

Finally, Zavala stated that his employment is governed by the MARBA Illinois Building

Agreement, which contains a union security clause, a hiring hall provision, and a check-off provision. *Id.* ¶ 4. Mark Beinlich, another Local 150 member, made similar statements. Specifically, he indicated that he works for Dick's Heavy Equipment Repair, also located in Lincolnshire. Pls.' Resp. to Defs.' Stat. of Facts, Tab 11 (Beinlich Decl.) ¶ 2. Beinlich stated that every day he reports to a facility in Lincolnshire and spends "50% to 60% of [his] workday" at this facility. *Id.* ¶ 3. These affidavits are sufficient to establish that Local 150 represents employees whose predominant job site is in Lincolnshire.

Lincolnshire argues that this Court should prohibit Local 150 from using these declarations in support of its motion. *See* Defs.' Reply at 10–11. Lincolnshire says that it served Local 150 with interrogatories requesting the names of every member currently working in Lincolnshire, as well as the number of hours these members spend there. *Id.* Local 150 declined to provide this information on the grounds that it was "irrelevant, cumulative, and overly burdensome." *See, e.g.*, Defs.' Reply, Tab 1 (Answers to Interrogs.) at 3. As a result, Lincolnshire argues, the Court should preclude Local 150 from using this information to support its response to Lincolnshire's motion under Federal Rule of Civil Procedure 37, which says that if a party fails to provide information as required by the rules of discovery, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Lincolnshire has not, however, identified any harm from the late disclosure of this information. The Court finds the late disclosure was harmless under Rule 37(c)(1).

Local 150 has established that it represents employees whose predominant work

site is in Lincolnshire and that at least one of these employees is party to an agreement containing the types of provisions prohibited by the ordinance. The Court therefore concludes that Local 150 has standing to bring all three claims.

### C.    LDC

Like Local 399, LDC appears to concede that it does not have standing to bring count 2, as it alleges only that it has entered into agreements "containing union security and check-off clauses," and not containing hiring hall provisions. *See* Pls.' Reply at 1 n.1. Lincolnshire argues that LDC also lacks standing to bring counts 1 and 3, on the grounds that it has not "identified a single employee it represents who actually spends most of his or her working hours in Lincolnshire." Defs.' Opening Br. at 7; *see also id.* at 8-9.

Two of the declarations that LDC points to in support of its standing do not permit an inference that any LDC members have Lincolnshire as their primary job site. The declaration of James Connolly, LDC's business manager, only discusses the bargaining agreements between LDC and the various employers and does not provide any evidence concerning how often LDC members worked in Lincolnshire. *See* Pls.' Stat. of Uncontested Facts, Tab 6 (Connolly Decl.). Further, the declaration of Daniel Davis, a member of LDC, is insufficient to permit the conclusion that LDC has standing. Davis states that he works for Central Boring, Inc., which is located in Lincolnshire. *Id.*, Tab 7 (Davis Decl.) ¶¶ 1–2. Although Davis states that he regularly works out of a facility in Lincolnshire, he describes this as "usually at least once a week." *Id.* ¶ 3. This is insufficient, without more, to meet the predominance standard in *Mobil Oil.* Further, although Davis states that he reports his hours to supervisors at Lincolnshire and

receives his paycheck from there, *id.* ¶ 4, the Supreme Court has indicated that these factors are insignificant in determining whether local labor laws apply to a particular employee. *See Mobil Oil*, 426 U.S. at 418.

The declaration of Edwin Stuckey, however, supports an inference that LDC has members whose primary job site is in Lincolnshire. Stuckey is the president of Stuckey Construction Company and party to an agreement with LDC. Pls.' Stat. of Uncontested Facts, Tab 8 (Stuckey Decl.) ¶¶ 1–2. Stuckey states that, from 2011 to 2014, he regularly employed LDC members to perform work for elementary schools in Lincolnshire. *Id.* ¶ 5. Further, Stuckey states that he currently employs LDC members who are working on a project at Stevenson High School in Lincolnshire. *Id.* ¶ 6. Lincolnshire argues that this evidence is insufficient to establish LDC's standing to challenge the ordinance as Stuckey does not "identify any employee who spends, has spent, or will spend the majority of his or her working hours in Lincolnshire." Def.'s Opening Br. at 7–8. But Lincolnshire does not identify any viable reason why identification of specific employees is required. Stuckey's affidavit is sufficient to carry LDC's burden to establish standing, and Lincolnshire has offered no contrary evidence. The Court finds that LDC has established its standing to bring counts 1 and 3.

### D. CRC

Like Local 399 and LDC, CRC appears to concede that it does not have standing to bring count 2, as it likewise has not entered into agreements containing hiring hall provisions. *See* Pls.' Resp. at 1 n.1. Lincolnshire argues that CRC lacks standing to bring counts 1 and 3 on the ground that it has not "alleged, let alone shown, that any unionized employee of either company" party to agreements with CRC "has ever

performed any work in Lincolnshire."  Defs.' Opening Br. at 8–9.

CRC has provided sufficient evidence to establish its standing to bring counts 1 and 3.  CRC provides the declaration of Robert Lid, CRC's contract and bonds manager, who states that CRC has agreements with Interior Investments and Build Corps, both of which are located in Lincolnshire.  *See* Pls.' Stat. of Uncontested Facts, Tab 9 (Decl. of Robert Lid) ¶¶ 6–7.  Lid further indicates that Interior Investments employs approximately fifty CRC members and that Build Corps employs four CRC members.  *Id.* ¶¶ 6–7.  Finally, Lid states that approximately 3,000 contractors are signatories to an agreement with CRC and have the ability to bid on and perform work in Lincolnshire.  *Id.* ¶ 9.  In conjunction with his declaration, Lid also provides reporting documents on Interior Investments and Build Corps that support his employment estimates.  *See* Decl. of Robert Lid, Exs. C & D.

In response, Lincolnshire again argues only that CRC's failure to identify particular employees renders its evidence insufficient.  Def.'s Opening Br. at 8.  The Court disagrees.  Lid's affidavit is sufficient to establish that CRC has members who work predominantly in Lincolnshire.

### 5.    Summary

The Court concludes that Local 399, LDC, and CRC each have standing to bring counts 1 and 3 but lack standing to bring count 2 and therefore grants Lincolnshire's motion for summary judgment to that extent only.  The Court concludes that Local 150 has standing to bring all three counts and therefore denies Lincolnshire's motion for summary judgment on the standing issue.

## II.    Section 1983 claim

The Unions have brought all three claims under both the Supremacy Clause of the Constitution and 42 U.S.C. § 1983.  Compl. ¶ 1.  In its cross-motion for summary judgment, Lincolnshire argues that the Unions have failed to state a claim under section 1983 because they cannot show that Lincolnshire violated a federally protected right. Defs.' Opening Br. at 24–25.

The Supreme Court has held that the NLRA creates rights for labor and management that are "enforceable against governmental interference in an action under § 1983."  *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108–09 (1989).  This appears to apply, however, only for certain types of preemption claims based on the NLRA.  The Court has identified two types of preemption under the NLRA. *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008).  The first, known as *Garmon* preemption, prohibits states from regulating activity that the NLRA protects or prohibits. *Id*.  The second, known as *Machinists* preemption, prohibits interference by states and the National Labor Relations Board (NLRB) on the ground that Congress intended certain conduct "to be controlled by the free play of economic forces."  *Id*.  The Court in *Golden State* found that the NLRA implicitly establishes a federal right protected by section 1983 based on a *Machinists* preemption challenge.  *Golden State*, 493 U.S. at 112.  In doing so, the Supreme Court expressly distinguished a challenge based on *Garmon* preemption.  *See id*.  The Court stated that "[t]he *Machinists* rule is not designed—as is the *Garmon* rule—to answer the question whether state or federal regulations should apply to certain conduct.  Rather, it is more akin to a rule that denies either sovereign the authority to abridge a personal liberty."  *Id*.  *Golden Gate* therefore

12

suggests that *Machinists* preemption claims are based on a personal liberty protected by section 1983, whereas *Garmon* preemption claims are not. In a subsequent case, the Court again indicated that *Garmon* preemption claims and *Machinists* preemption claims may be treated differently for the purpose of claims brought under section 1983. *See Livadas v. Bradshaw*, 512 U.S. 107, 133 & n.27 (suggesting that *Garmon* preemption is "fundamentally different" from *Machinists* preemption and that this difference may be significant when deciding the availability of section 1983 relief).

The Unions appear to have brought their claims as *Garmon* preemption claims. They do not argue that Lincolnshire has abridged a right or course of conduct that Congress intended to leave to the control of the free market. Instead, the Unions argue that Lincolnshire has attempted to regulate an area otherwise reserved to the federal government through the NLRA. The Unions' claims therefore do not fall within the reach of section 1983 as established by *Golden State*. The Court therefore dismisses the Unions' claims under 42 U.S.C. § 1983. The Court evaluates the Unions' claims under the Supremacy Clause in the section that follows.

**III.    Preemption claim**

The Unions argue that the challenged provisions of the ordinance are preempted by the NLRA and that the Unions are entitled to judgment as a matter of law. Pls.' Opening Br. at 1. In its cross-motion, Lincolnshire argues that the ordinance falls under a preemption exception in the NLRA and that therefore Lincolnshire is entitled to summary judgment.

**A.    Count 1**

In count 1, the Unions claim that sections 4(A)–(D) of the Lincolnshire ordinance

are preempted by the NLRA.  Compl. ¶¶ 32–37.  They contend that the NLRA generally preempts state and local regulation of labor relations.  Further, the Unions argue that the preemption exception created by 29 U.S.C. § 164(b) applies only to state, and not local, ordinances.

It is well-accepted "that in passing the NLRA Congress largely displaced state regulation of industrial relations."  *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986).  Thus states "may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits."  *Id.*  The NLRA does, however, create a single exception.  The NLRA states that it shall not be construed "as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or territorial law."  29 U.S.C. § 164(b).  The Supreme Court has interpreted section 164(b) as creating an exception to the NLRA's "national policy that certain union-security agreements are valid as a matter of law" in that it permits "any State or Territory that wishes" to exempt itself from that policy.  *Mobil Oil*, 426 U.S. at 416–17; *see also Sweeney v. Pence*, 767 F.3d 654, 659–660 (7th Cir. 2014).  In other words, section 164(b) permits states to regulate or prohibit the use of union security agreements.

Both parties appear to agree that the ordinance provisions challenged in count 1 prohibit union security agreements, which are agreements that require union membership as a condition of employment.  *See* Pls.' Opening Br. at 3 & n.2; Defs.' Opening Br. at 9–14.  There is no question if the State of Illinois had adopted a statute enacting the same provisions at issue in count 1, the provisions would not be

14

preempted by the NLRA, as they would fall within the exception created by section 164(b). *See* Pls.' Opening Br. at 5. The Unions argue, however, that the exception in section 164(b) does not extend to local law and therefore does not permit Lincolnshire, a municipality, to prohibit union security agreements. Pls.' Opening Br. at 6.

Neither the Supreme Court nor the Seventh Circuit has expressly addressed whether the power given to states and territories in the NLRA to prohibit union security agreements extends to political subdivisions of the state. In considering the same question regarding other statutes, however, the Supreme Court has indicated that whether an exception for state regulation also extends to local regulation depends on whether Congress, in enacting the statute, intended to occupy the entire field. *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607 (1991) (considering preemption of local law under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)). When a federal statute preempts a particular field but provides an exception for regulation by a state, the statute should not be read as *restricting* only a narrow set of state regulation—i.e., that which falls outside of the exception. *Id.* at 616 (Scalia, J., concurring). If this were so, it would make sense to conclude that the local subdivisions faced the same narrow restriction and were otherwise free to regulate. *Id.* Instead, where the statute preempts a particular field, the statute should be read as *authorizing* only a narrow set of state regulation, in which case it makes sense that only states and not their subdivisions would benefit from this limited authorization. *Id.* In other words, when Congress has intended a statute to preempt regulation in that field, any exception to such preemption must be read as a narrow authorization—as opposed to an expansive protection—of state regulation. Therefore if the NLRA preempts the field of

union security agreements, the exception for state regulation in section 164(b) does not extend to regulation by local subdivisions.

### 1.    Preemption

A review of the language and history of the NLRA indicates that Congress intended to preempt the field of union security agreements.  The language of section 164(b) only refers to state law.  The section provides that the NLRA does not authorize union security agreements "in any State or Territory" where "State or Territorial law" prohibits these agreements.  The provision avoids any mention of local law, in contrast to section 164(a), which says that no employer is required to deem individuals as supervisors "for the purpose of any law, either national or local," 29 U.S.C. § 164(a), and the Fair Labor Standards Act (FLSA), passed around the same time, which says that nothing in the FLSA "shall excuse noncompliance with any Federal or State law or municipal ordinance . . . ."  29 U.S.C. § 218(a).  Thus, in contemplating the scope of a national policy on labor relations, Congress clearly articulated when local ordinances can override this policy.  Section 164(b) evinces no such intent, and its exception therefore extends only to state law.

The legislative history further supports the conclusion that Congress intended to preempt the field of union security agreements.  As noted by the Supreme Court, the House Report on the NLRA itself stated that "by the Labor Act Congress preempts the field that the act covers."  *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 101 n.8 (1963) (quoting H.R. Rep. No. 510, 80th Cong., 1st Sess., p. 44).  The Court then went on to conclude that Congress added section 164(b) to make clear that the NLRA did not preempt state law on the particular topic covered

by that section. *See id.* In doing so, the Court did note that Congress "chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and application of agreements authorized by [§ 164(b)] and decided to suffer a medley of attitudes and philosophies on the subject." *Id.* at 104–05. But the issue before the Court was "whether the Congress had precluded *state enforcement of select state laws* adopted pursuant to its authority." *Id.* at 103 (emphasis added). The Court went on to conclude that the "special legislative history" of the NLRA required "[s]tate power . . . to exist alongside of federal power," *id.* at 104, in light of the purpose of "avoid[ing] federal interference with *state* laws in this field," *id.* at 102 (emphasis added). *Schermerhorn* therefore does not contradict the conclusion that Congress intended to preempt the field of union security agreements, leaving an exception only for regulation by the states. And as discussed by Justice Scalia in *Mortimer*, this congressional intent to preempt thus makes it reasonable to interpret section 164(b) as a narrow authorization that does not extend to local regulation of union security agreements.

Finally, extending the preemption exception to local ordinances would create an impossibly disparate system that would undermine Congress's intent to create uniformity in the regulation of labor relations. The Supreme Court has held that the NLRA "articulates a national policy that certain union-security agreements are valid as a matter of federal law." *Mobil Oil*, 426 U.S. at 417. Though section 164(b) permits a narrow exception for authorized state regulation, it is highly unlikely that Congress intended to subject this national policy to the patchwork scheme that would result from city-by-city or county-by-county regulation of such agreements. If the NLRA permitted

local governmental entities to enact their own laws regarding union security agreements, "[t]he result would be a crazy-quilt of regulations within the various states." *See N.M. Fed'n of Labor, United Food and Commercial Workers Union Local 1564 v. City of Clovis*, 735 F. Supp. 999, 1002 (D.N.M. 1990).  And because unions often enter into agreements that cover employees across multiple cities and towns within a given state, these agreements would be subject to multiple, potentially conflicting, laws.  This would make it difficult for unions to comply with local law and would create a strong "incentive to abandon union security agreements," thereby undermining Congress's creation of a federal policy in favor of such agreements.  *Id.* at 1003.  And the Supreme Court in *Mobil Oil* indicated that section 164(b) should be interpreted such that "parties entering a collective-bargaining agreement will easily be able to determine in virtually all situations whether a union- or agency-shop provision is valid."  *See Mobil Oil*, 426 U.S. at 419.  In sum, the Court concludes that section 164(b) does not permit local subdivisions to regulate union security agreements.

### 2.    *Mortier* **and** *Ours Garage*

In arguing that the exception under section 164(b) extends to local laws, Lincolnshire points to two decisions by the Supreme Court addressing a parallel issue in the context of other statutes.  Although the Court ruled in both cases that a statutory preemption exception for state regulation extended to local subdivisions as well, the statutes in those cases are distinguishable from the NLRA and therefore do not persuade this Court to find that the same extension applies here.

In *Mortier*, mentioned above, the Court considered a provision of FIFRA which provides that "[a] State may regulate the sale or use of any federally registered pesticide

or device in the State." *Mortier*, 501 U.S. at 606 (citing 7 U.S.C. § 136v(a)). The Court

first concluded that FIFRA is not "a comprehensive statute that occupie[s] the field of

pesticide regulation," finding that there was neither a clear indication that Congress

intended this result nor evidence from which to infer preemption. *Mortier*, 501 U.S. at

612. Because FIFRA does not preempt the field, the Court held that the reference to

"States" in section 136v(a) preserves state power in this area, which includes a state's

ability to allocate its regulatory authority to political subdivisions. *Id.* at 612, 608.

As discussed above, Congress—in adopting the NLRA—intended to create a

federal policy in favor of union security agreements and otherwise preempt the field in

order to impose greater uniformity in the regulation of labor relations. The NLRA is

therefore distinguishable from FIFRA and *Mortier*'s determination that the Act's

exception for state regulations extends to local regulation as well. Because the NLRA

preempts regulation in this area, the exception for state authority in section 164(b) only

"authoriz[es] certain types of state regulation (for which purpose it makes eminent sense

to authorize States but not their subdivisions)." *See id.* at 616 (Scalia, J., concurring).

This holding is likewise consistent with the Supreme Court's ruling in *City of

Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424 (2002). There, the

Court considered a provision of the Interstate Commerce Act stating that the Act's

prohibition against state or local regulation "related to a price, route, or service of any

motor carrier" would not "restrict the safety regulatory authority of a State with respect to

motor vehicles." *Id.* at 428 (citing 49 U.S.C. § 14501(c)(1)–(2)). The Court determined

that—despite the fact that the exception in section 14501(c)(2) omitted any mention of

political subdivisions while section 14501(c)(1) included one—Congress intended

section 14501(c)(2) to permit local exercise of safety regulatory authority. *Id.* at 439–40. The Court suggested that when a statute's specific exception to preemption "might tend against" the general policy aim of a statute, the exception should be narrowly construed. *Id.* at 440. The Court then determined that the purpose of the Interstate Commerce Act—to preempt *economic* regulation—does not conflict with the statute's exception for state *safety* regulation. *See id.* at 441. The Court therefore determined that the exception in section 14501(c)(2) need not be construed narrowly in order to avoid interfering with the general policy aims of the Interstate Commerce Act.

This principle further indicates that the exception for state regulation in section 164(b) of the NLRA does not extend to local regulation. The NLRA expressly "permits employers as a matter of federal law to enter into agreements with unions to establish union or agency shops." *Mobil Oil*, 426 U.S. at 410; *see also* 29 U.S.C. § 153(a)(3). The result of such provision is a federal policy that favors permitting union security agreements. *Mobil Oil*, 426 U.S. at 420. Because the preemption exception in section 164(b) directly conflicts with the statute's policy aim, it must be read narrowly and not expanded to permit local regulation of these agreements.

In arguing otherwise, Lincolnshire relies heavily on a recent decision by the Sixth Circuit in which the court held that section 164(b) extends to local law and therefore that an ordinance similar to Lincolnshire's was not preempted by the NLRA. *See generally United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin Cty.*, 842 F.3d 407 (6th Cir. 2016). The Sixth Circuit analyzed the language of section 164(b), as well as *Mortier* and *Ours Garage*, and concluded that the dispositive question was whether Congress had indicated "a clear and manifest purpose to preempt state

20

authority to delegate governmental power to its political subdivisions." *Id.* at 420. The court ultimately determined that there was no showing of a clear and manifest purpose and therefore that section 164(b) permits local subdivisions to regulate union security agreements. *Id.* Though this Court relies on the same sources, it respectfully disagrees with the Sixth Circuit's determination of the point. The dispositive question is not whether Congress intended to preempt state authority to delegate governmental power. Rather, the question is whether Congress intended to preempt legislation in general in the field of union security agreements. Because this Court concludes that Congress, with its passage of the NLRA, did have this intention, *Mortier* and *Ours Garage* require the exception in section 164(b) to be read narrowly to extend to states and no further.

This Court therefore concludes that laws of political subdivisions do not qualify as "State law" under 29 U.S.C. § 164(b) and therefore that sections 4(A)–(D) of the ordinance are preempted by the NLRA. Accordingly, the Court grants summary judgment in favor of the Unions on count 1.

### B.    Count 2

In count 2, the Unions challenge section 4(E) of the Lincolnshire ordinance, which prohibits unions from imposing hiring hall provisions in its agreements with employers. Only Local 150 has negotiated any agreements containing hiring hall provisions, and therefore only Local 150 has standing to bring count 2. Because the Court holds that local ordinances do not qualify as state law under section 164(b), section 4(E) of Lincolnshire's ordinance is likewise preempted by the NLRA. But even if the Court had determined that section 164(b) permits local regulation of union security agreements, Local 150 would still be entitled to summary judgment on count 2.

Section 164(b) permits states to prohibit only "agreements requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b). Courts have therefore held that the NLRA permits states to regulate only those provisions that amount to "compulsory unionism." *See Simms v. Local 1752, Int'l Longshoremen Ass'n*, 838 F.3d 613, 619–20 (5th Cir. 2016). Hiring hall provisions—requiring that all new hires by an employer be referred through a labor organization—do not amount to compulsory unionism. The result of a hiring hall provision is typically that non-union members looking to work for a particular employer are required to pay a small fee to the hiring hall for their referral service. The Fifth Circuit in *Simms* considered a similar provision and concluded that the state of Mississippi was not permitted to prohibit hiring hall arrangements. *Id.* In doing so, the court emphasized that charging referral fees relates to an employee's "pre-hire" conduct, which does not amount to compelled union membership. *Id.* Section 164(b) permits states to regulate only "the [p]ost-hiring employer-employee-union relationship." *Mobil Oil*, 426 U.S. at 417. Because the hiring hall provisions require individuals to pay referral fees before they are hired, they do not require membership in a labor organization as a condition of employment. Therefore, section 164(b) does not give states or its subdivisions the authority to regulate these provisions. The Court concludes that section 4(E) of the ordinance is preempted by the NLRA and grants summary judgment on count 2 in favor of Local 150.

## C.    Count 3

In count 3, the Unions challenge section 5 of the Lincolnshire ordinance, which requires any "dues check-off arrangement"—whereby an employee authorizes his employer to automatically deduct union dues from his paycheck—to be revocable by the

employee at any time.  The Unions are entitled to summary judgment on this claim,
because the ordinance is preempted by the NLRA and does not fall within the exception
in section 164(b).  And even if the Court had held that section 164(b) permits local
regulation, the Unions would still be entitled to summary judgment on count 3, because
the regulation of check-off provisions—either by states or by their subdivisions—is
preempted by the LMRA.

The LMRA authorizes check-off arrangements so long as the employee makes "a
written assignment" to his employer "which shall not be irrevocable for a period of more
than one year."  29 U.S.C. § 186(c)(4).  The LMRA's express regulation of this aspect of
labor relations is sufficient to preempt state regulation, given that Lincolnshire's
ordinance conflicts with section 186(c)(4).  *See Patriotic Veterans, Inc. v. State of
Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013) ("conflict preemption" arises "when state
law conflicts with federal law to the extent that compliance with both federal and state
regulations is a physical impossibility" (internal quotation marks omitted)).  Lincolnshire
argues that this is not the case, because an employee may satisfy both the LMRA and
the ordinance simply by having a check-off agreement that is revocable at any time.
But in the context of labor relations, the Supreme Court has made it clear that if a
particular agreement could meet all federal hurdles but not all state hurdles, then the
hurdles imposed by state law conflict with federal law.  *Schermerhorn*, 375 U.S. at 102–
03.  In *Schermerhorn*, the Court found such a conflict to be permissible, but only
because the conflict was authorized by Congress in section 164(b).  *Id.* at 103.  The
Court concluded, essentially, that the language of section 164(b) permits states to
impose more stringent requirements on union security agreements, despite the fact that

such requirements would conflict with the NLRA.

Section 164(b) does not, however, permit states to regulate check-off arrangements as it does union security agreements. This is, again, because check-off arrangements clearly do not amount to the "compulsory unionism" that states are permitted to regulate under section 164(b). The LMRA does not require employees to use a check-off provision for union dues—it merely enables them to do so. Employers cannot deduct the dues automatically but instead must have written authorization from each employee. Thus check-off arrangements do not compel employees to unionize; they simply make it easier for those who are union members to pay their dues. Lincolnshire argues that "a worker who decides that he or she no longer wants to pay union fees, but who cannot immediately revoke his or her dues authorization" is compelled to accept union membership as a condition of his or her employment for some period of time. Defs.' Opening Br. at 22. But giving an employee the choice whether to enter into a dues check-off arrangement, and permitting the arrangement to be irrevocable for a certain period of time, does not amount to compulsory unionism.

Because section 5 of Lincolnshire's ordinance imposes more stringent requirements than federal law, it conflicts with the LMRA. This conflict is not authorized by section 164(b), and therefore section 5 of the ordinance is preempted. The Court grants summary judgment in favor of the Unions on count 3.

### Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment in part and denies it in part [dkt. no. 52]. Specifically, the Court dismisses the claims of plaintiffs Local 399, LDC, and CRC in count 2 for lack of standing and

dismisses all of the plaintiffs' claims brought under 42 U.S.C. § 1983 but otherwise

denies defendants' motion. The Court also grants plaintiffs' motion for summary

judgment in part and denies it in part [dkt. no. 35]. Specifically, the Court grants

summary judgment in favor of plaintiffs Local 399, LDC, and CRC on counts 1 and 3

and in favor of Local 150 on counts 1, 2, and 3 and concludes that federal law preempts

the union security agreement, hiring hall, and dues check-off provisions of Lincolnshire

Ordinance No. 15-3389-116. The Court otherwise denies plaintiffs' motion. Plaintiffs

are directed to file a proposed form of judgment by no later than January 12, 2017. The

case is set for a status hearing on January 18, 2017 at 9:30 a.m. for the purpose of

addressing and entering an appropriate judgment.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 7, 2017